UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 20-10153-RGS

N.R., by and through his parents and guardians, S.R. and T.R.,
individually and on behalf of all others similarly situated, and derivatively
on behalf of the Raytheon Health Benefits Plan

v.

RAYTHEON COMPANY; RAYTHEON HEALTH BENEFITS PLAN; and
WILLIAM M. BULL

MEMORANDUM AND ORDER ON
DEFENDANTS' MOTION TO DISMISS

June 9, 2020

STEARNS, D.J.

N.R. is the named plaintiff in this putative class action brought against defendants Raytheon Health Benefits Plan (Plan), an employee benefit plan within the meaning of the Employee Retirement Income Security Act (ERISA); Raytheon Company, the Plan Sponsor; and William M. Bull, the Plan Administrator. N.R. brings four claims under ERISA, each of which is predicated upon an allegation that the defendants' exclusion of coverage for non-restorative speech therapy as an autism spectrum disorder (ASD) treatment violates the Paul Wellstone and Pete Domenici Mental Health Parity and Addiction Equity Act of 2008 (MHPAEA, or Parity Act).

Specifically, N.R. alleges that "the Plan's exclusion of coverage of speech therapy that is 'non-restorative," its exclusion of "non-restorative [Applied Behavior Analysis (]ABA[)] speech therapy" in particular, and its exclusion of "habilitation [sic] services," is specifically "aimed at eliminating coverage of speech therapy and other services for developmental mental health conditions." Compl. ¶ 9 (Dkt # 1).  N.R. argues that these "[e]xclusions are a proxy for disability discrimination, and improperly exclude coverage of medically necessary services to enrollees with developmental mental health conditions." *Id.*

The Complaint sets out the following four claims: breach of fiduciary duties under ERISA §§ 404(a)(1), 502(a)(2), 29 U.S.C. §§ 1104(a), 1132(a)(2) (Count 1); recovery of benefits under ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B) (Count 2); equitable remedies under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3) (Count 3); and sanctions for alleged violation of ERISA disclosure requirements (Count 4).  Defendants move to dismiss all Counts. For the reasons to be explained, Counts 1 and 2 will be dismissed with prejudice; Counts 3 and 4 will be dismissed without prejudice.

## BACKGROUND

The facts, drawn from the Complaint and documents incorporated by reference, when viewed in the light most favorable to N.R. as the nonmoving

party, are as follows.   Raytheon administers the Plan, an employer-sponsored health insurance plan.   T.R., an employee of Raytheon Company, is a plan participant.   N.R., who is five years old, is a dependent of T.R. and S.R.   In 2017, a physician diagnosed N.R. with ASD and recommended that N.R. "receive speech therapy services to treat his ASD."   Compl. ¶ 25.   A licensed speech pathologist provided speech therapy to N.R., "to treat N.R.'s identified diagnoses of ASD (F84.0), Mixed receptive-expressive language disorder (F80.2), and phonological disorder (F80.0)."   Compl. ¶ 27.   N.R. sought coverage for the pathologist's services totaling $1,790.00, but was denied coverage by United Healthcare – the "Claims Administrator" for the Plan.   Dkt # 1-3 at 2, 5.   United Healthcare explained that "this service is not covered for the diagnosis listed on the claim."   Compl. ¶ 32, quoting Dkt # 1-2.

In April of 2019, N.R.'s parents appealed United Healthcare's denial of coverage.   They argued that "(1) Speech therapies are medically necessary mental health services and should be covered under United Healthcare's mental disorders benefit," and that "(2) United Healthcare's restriction of covering only 'restorative speech therapy' violates the federal Mental Health Parity and Addiction Equity Act of 2008."   Dkt # 1-11 at 3; *see* 29 U.S.C. § 1185a(a)(3); 42 U.S.C. § 300gg-5; 26 U.S.C. § 9812(a)(3).

United Healthcare rejected the appeal.  In so doing, it quoted from the language of N.R.'s benefit plan, explaining that:

> [H]abilitative services (defined in Exclusions later in this section) are not covered. For a description of limitations and exclusions related to the treatment of ASD, including a definition of habilitative services, see later in this section.  For more information, or if you have any questions, contact UHC.

> Autism Spectrum Disorder (ASD) refers to a range of conditions characterized by challenges with social skills, repetitive behaviors, speech and nonverbal communication, as well as by unique strengths and differences.  The term "spectrum" reflects the wide variation in challenges and strengths possessed by each person with autism.

> Note: To be considered covered services, speech and nonverbal communication services must comply with *restorative-only* requirements.  To be considered restorative, the speech or nonverbal communication function must have been previously intact.

Dkt # 1-3 at 4, quoting Dkt # 1-12 at 37.  United Healthcare also quoted language located elsewhere in the Plan:

> Short-Term Rehabilitative Therapy (includes physical therapy, speech therapy (restorative only), occupational therapy, pulmonary therapy or cardiac rehabilitation)

> . . .

> Rehabilitation benefits (outpatient physical, occupational, speech (restorative only), pulmonary rehabilitation and cardiac rehabilitation therapy) may be denied or shortened for a covered person who is not progressing in goal-directed rehabilitation services or if rehabilitation goals have previously been met.

4

> The following mental health (including Autism Spectrum Disorder (ASD) services)/substance-related and addictive disorders services are not covered:
>
> -Habilitative services, which are health care services that help a person keep, learn or improve skills and functioning for daily living, such as non-restorative ABA speech therapy;
>
> -Speech therapy for non-restorative purposes.

*Id.* at 4-5, quoting Dkt # 1-12 at 52, 58, 64, 80, 83.  Finally, United Healthcare forwarded the explanation of its Medical Director, Dr. Samuel Wilmit, who stated:

> You are asking for speech therapy.  This is for your child. Your child is autistic. Your child does not speak clearly.  Your benefit document covers speech therapy if your child lost speech.  It is to restore speech that was lost.  Your child has not had speech that was lost.  Therefore, speech therapy is not covered.  The appeal is denied.

*Id.* at 3.  Accordingly, United Healthcare concluded that "[b]ecause the claim(s) for this service(s) was processed according to the above plan provisions, the original determination remains unchanged, and is upheld." *Id.* at 5.  The response did not address N.R.'s parents' Parity Act argument.

When N.R.'s parents lodged a second-level appeal in August of 2019, they provided United Healthcare with additional evidence supporting their contention that speech therapy for N.R. was medically necessary.  United Healthcare denied the second-level appeal in September of 2019, without addressing the issue of medical necessity or the ramifications of the Parity

Act.  Rather, United Healthcare's Medical Director, Dr. Meenakshi LaCorte,

iterated what had been said before:

> I have reviewed the information that was submitted for this
> appeal.  I have also reviewed your benefits.  You have requested
> speech therapy for your child.  This therapy is a benefit under
> your health plan only if your child's had speech that was lost.
> Based on your health plan guidelines, your request is denied.

Compl. ¶ 40, quoting Dkt # 1-7 at 3.  Following the denial of the appeal, N.R.'s

parents

> contacted Raytheon and United Healthcare to obtain (a) the list
> of non-mental health conditions to which the Plan applies the
> "non- restorative" speech therapy exclusion, and (b) the "medical
> necessity criteria for both medical/surgical benefits and mental
> health and substance use disorder benefits, as well as the
> processes, strategies, evidentiary standards and other factors
> used to apply" the "non-restorative speech therapy" exclusion,
> the "non-restorative ABA speech therapy" exclusion and the
> exclusion of "habilitative services" under the Plan.

Compl. ¶ 48, quoting Dkt # 1-8 at 2 (letter dated October 22, 2019), 29 C.F.R.

§ 2590.712(d)(3).  United Healthcare did not respond to their requests.

## DISCUSSION

"To survive a motion to dismiss, a complaint must contain sufficient

factual matter, accepted as true, to 'state a claim to relief that is plausible on

its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), quoting *Bell Atl. Corp.*

*v. Twombly*, 550 U.S. 544, 570 (2007).  Two basic principles guide the

court's analysis.  "First, the tenet that a court must accept as true all of the

allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678. "Second, only a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* at 679. A claim is facially plausible if its factual content "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678. "If the factual allegations in the complaint are too meager, vague, or conclusory to remove the possibility of relief from the realm of mere conjecture, the complaint is open to dismissal." *S.E.C. v. Tambone*, 597 F.3d 436, 442 (1st Cir. 2010).

Generally, in ERISA cases, "where the plan documents grant the claims administrator full discretionary authority, the decision [to deny benefits] is reviewed for abuse of discretion." *McDonough v. Aetna Life Ins. Co.*, 783 F.3d 374, 379 (1st Cir. 2015). Here, N.R. alleges that both Bull and Raytheon Company exercise "discretionary authority or discretionary control with respect to the denial and appeal of denied claims under the Plan." Compl. ¶¶ 62, 63. The discretionary authority of the Plan Administrator or fiduciary is not, however, in question here. N.R. alleges a violation of the MHPAEA, and not a denial of a benefit otherwise covered by the Plan. Consequently, the issue is purely one of law subject to de novo review. *See Joseph F. v. Sinclair Servs. Co.*, 158 F. Supp. 3d 1239, 1258 (D. Utah 2016), citing *Foster v. PPG*

*Indus., Inc.*, 693 F.3d 1226, 1233 (10th Cir. 2012) ("Although the court reviews the Plan Administrator's decision to deny benefits based on its interpretation of Plan terms under an arbitrary and capricious standard, the court affords the Administrator's interpretation of the Parity Act no deference because the interpretation of a statute is a legal question."). "Although there is no private right of action under the Parity Act, portions of the law are incorporated into ERISA and may be enforced using the civil enforcement provisions in ERISA § 502." *Munnelly v. Fordham Univ. Faculty*, 316 F. Supp. 3d 714, 728 (S.D.N.Y. 2018), quoting *Am. Psychiatric Ass'n v. Anthem Health Plans*, 50 F. Supp. 3d 157, 161 (D. Conn. 2014) (citations omitted).

### The Mental Health Parity and Addiction Equity Act of 2008

The MHPAEA

> expands the scope of prior legislation, the Mental Health Parity Act of 1996 ("MHPA"), Pub. L. No. 104-204, §§ 701-02, 110 Stat. 2874, 2944 (Sept. 26, 1996). The MHPA and the MHPAEA are designed to end discrimination in the provision of coverage for mental health and substance use disorders as compared to medical and surgical conditions in employer-sponsored group health plans and health insurance coverage offered in connection with group health plans.

*Coal. for Parity, Inc. v. Sebelius*, 709 F. Supp. 2d 10, 13 (D.D.C. 2010).

Insofar as relevant here, the MHPAEA provides that:

[i]n the case of a group health plan (or health insurance coverage offered in connection with such a plan) that provides both medical and surgical benefits and mental health or substance use disorder benefits, such plan or coverage shall ensure that—

. . .

(ii) the treatment limitations applicable to such mental health or substance use disorder benefits are no more restrictive than the predominant treatment limitations applied to substantially all medical and surgical benefits covered by the plan (or coverage) and there are no separate treatment limitations that are applicable only with respect to mental health or substance use disorder benefits.

29 U.S.C. § 1185a(a)(3)(A)(ii).  While this language "is quite clear," *Danny P. v. Catholic Health Initiatives*, 891 F.3d 1155, 1158 (9th Cir. 2018), it also "has necessarily left some room for uncertainty or ambiguity regarding its application to specific ERISA plan terms and situations."  *Id.*

Under the MHPAEA, "[t]he term 'treatment limitation' includes limits on the frequency of treatment, number of visits, days of coverage, or other similar limits on the scope or duration of treatment."  29 U.S.C. § 1185a(a)(3)(B)(iii).  The MHPAEA implementing regulations provide that "[t]reatment limitations include both quantitative treatment limitations . . . and nonquantitative treatment limitations . . . ."  29 C.F.R. § 2590.712(a).[1]

---

[1] In the MHPAEA, "Congress delegated to the Department of Labor, the Department of Health and Human Services, and the Department of Treasury . . . to issue 'guidance and information' on the Parity Act's requirements."  *B.D. v. Blue Cross Blue Shield of Georgia*, 2018 WL 671213,

While quantitative treatment limitations "are expressed numerically (such as 50 outpatient visits per year)," "nonquantitative treatment limitations . . . otherwise limit the scope or duration of benefits for treatment under a plan or coverage." *Id.* As relevant here, with respect to nonquantitative treatment limitations, section (c) of the implementing regulations – addressing "[p]arity requirements with respect to financial requirements and treatment limitations" – provides that

> [a] group health plan (or health insurance coverage) may not impose a nonquantitative treatment limitation with respect to mental health or substance use disorder benefits *in any classification* unless, under the terms of the plan (or health insurance coverage) as written *and in operation*, any processes, strategies, evidentiary standards, or other factors used in applying the nonquantitative treatment limitation to mental health or substance use disorder benefits in the classification are comparable to, and are applied no more stringently than, the processes, strategies, evidentiary standards, or other factors used in applying the limitation with respect to medical/surgical benefits in the classification.

---

at *2 (D. Utah Jan. 31, 2018), quoting 29 U.S.C. § 1185a(g). "In February 2010, four months after the Parity Act took effect, the Departments published the Interim Final Rules (IFRs)." *V. v. Health Care Serv. Corp.*, 2016 WL 4765709, at *4 (N.D. Ill. Sept. 13, 2016). "In November 2013, the Departments published the final regulations, which the agencies declared would apply to health-plan years beginning on or after July 1, 2014." *Id.* at *5, citing Final Rules Under the MHPAEA; Technical Amendment to External Review for Multi-State Plan Program, 78 FR 68240-01, Preamble (Final Rules). "[T]o the extent that the Departments have now interpreted the Parity Act, [the court] will consider their constructions." *Danny P.*, 891 F.3d at 1159.

29 C.F.R. § 2590.712(c)(4)(i) (emphasis added).

Thus, under the MHPAEA's implementing regulations, treatment limitation comparisons across mental health and medical/surgical benefits are to be made within discrete benefit "classification[s]." *See* 29 C.F.R. § 2590.712(c)(2)(ii)(A) ("To the extent that a plan (or health insurance coverage) provides benefits in a classification and imposes any . . . treatment limitation . . . for benefits in the classification, the rules of this paragraph (c) apply separately with respect to that classification for all . . . treatment limitations . . . ."). The implementing regulations enumerate six classifications of benefits, which "are the only classifications used in applying the rules of this paragraph (c): [i]npatient, in-network . . . [i]npatient, out-of-network . . . [o]utpatient, in-network . . . [o]utpatient, out-of-network . . . [e]mergency care . . . [and] [p]rescription drugs." *Id.* § 2590.712(c)(2)(ii)(A)(1)-(6). "The Parity Act prohibits disparate coverage among only treatments that belong in the same classification." *Bushell v. UnitedHealth Grp. Inc.*, 2018 WL 1578167, at *7 (S.D.N.Y. Mar. 27, 2018).

Quantitative and nonquantitative treatment limitations within each classification are assessed differently to determine MHPAEA compliance. *See* Final Rules, 78 FR 68240-01, Preamble ("These final regulations continue to provide different parity standards with respect to quantitative

treatment limitations and [nonquantitative treatment limitations], because although both kinds of limitations operate to limit the scope or duration of mental health and substance use disorder benefits, they apply to such benefits differently.").   With respect to assessments of nonquantitative treatment limitations in particular:

> [d]isparate results alone do not mean that the [nonquantitative treatment limitations] in use do not comply with [MHPAEA] requirements. . . . However, MHPAEA specifically prohibits separate treatment limitations that are applicable only with respect to mental health or substance use disorder benefits. . . . [I]t is unlikely that a reasonable application of [a given nonquantitative treatment limitation] requirement would result in all mental health or substance use disorder benefits being subject to a[] [nonquantitative treatment limitation] in the same classification in which less than all medical/surgical benefits are subject to the [nonquantitative treatment limitation].

*Id.* at 68245.  "Plans and issuers must assign covered intermediate mental health and substance use disorder benefits to the existing six benefit classifications in the same way that they assign comparable intermediate medical/surgical benefits to these classifications."  *Id.* at 68247.

Finally, as the language of 29 C.F.R. § 2590.712(c)(4)(i) makes clear, the MHPAEA's implementing regulations provide a foundation for both facial and as-applied claims.  "[F]or a facial Parity Act claim, Plaintiffs must plausibly allege that the Plan imposes 'separate treatment limitations' only on mental health/substance abuse services or promulgates 'more restrictive

treatment limitations' for mental health/substance abuse care than the Plan uses for the analogous covered medical/surgical services." *Johnathan Z. v. Oxford Health Plans*, 2020 WL 607896, at *15 (D. Utah Feb. 7, 2020), quoting 29 U.S.C. § 1185a(a)(3)(A)(ii).  Alternatively, a Parity Act challenge may be brought if a plan "differentially applies a facially neutral plan term." *Vorpahl v. Harvard Pilgrim Health Ins. Co.*, 2018 WL 3518511, at *4 (D. Mass. July 20, 2018); *see also Alice F. v. Health Care Serv. Corp.*, 367 F. Supp. 3d 817, 829 (N.D. Ill. 2019) ("Parity concerns may also arise by a plan's practice of covering services differently even though they appear to be treated equally under the plan . . . ."); *A.Z. by & through E.Z. v. Regence Blueshield*, 333 F. Supp. 3d 1069, 1082 (W.D. Wash. 2018), citing *Vorpahl*, 2018 WL 3518511, at *4 ("Put differently, A.Z. contends that the improper exclusion occurs in application rather than by the Plan's terms.   These allegations are also a sufficient, independent basis to allege a Parity Act claim.").   In this sense, an "as-applied" challenge under the MHPAEA is broader in scope than the plan's application to a single plaintiff – addressing more generally the way in which the terms of a plan are set "in operation." 29 C.F.R. § 2590.712(c)(4)(i).

## Count 1: Breach of fiduciary duties under 29 U.S.C. § 1132(a)(2)

A civil action under 29 U.S.C. § 1132(a)(2) may be brought "by the Secretary, or by a participant, beneficiary or fiduciary for appropriate relief under section 1109 of this title."  Section 1109, in turn, provides in relevant part that

> [a]ny person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good *to such plan* any losses *to the plan* resulting from each such breach, and to restore *to such plan any profits of such fiduciary* which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

29 U.S.C.A. § 1109(a) (emphasis added).

"As § 1132(a)(2) addresses losses to ERISA plans resulting from fiduciary misconduct, the Supreme Court has held that suits under it are derivative in nature – that is, while various parties are entitled to bring suit (participants, beneficiaries, fiduciaries, and the Secretary of Labor), they do so on behalf of the plan itself." *Graden v. Conexant Sys. Inc.*, 496 F.3d 291, 295 (3d Cir. 2007) (footnote omitted); *see also LaRue v. DeWolff, Boberg & Assocs., Inc.*, 552 U.S. 248, 256 (2008) (emphasis added) ("[A]lthough § 502(a)(2) *does not provide a remedy for individual injuries distinct from plan injuries*, that provision does authorize recovery for fiduciary breaches

that impair the value of plan assets in a participant's individual account."); *Walter v. Int'l Ass'n of Machinists Pension Fund*, 949 F.2d 310, 317 (10th Cir. 1991) ("Under section 1109, a fiduciary who breaches his fiduciary duty is liable to the plan – not to the beneficiaries individually.").

Here, N.R. alleges that defendants Bull and Raytheon Company violated ERISA §§ 404(a)(1), 502(a)(2), 29 U.S.C. §§ 1104(a), 1132(a)(2), "by failing to act in accordance with the documents and instruments governing the Plan, [thus] breach[ing] their fiduciary duties to the Plan, N.R. and all class members." Compl. ¶ 67.  N.R. claims that he "and other class members have suffered harm and losses and are entitled to relief under ERISA against defendants." *Id.* ¶ 68.  They "seek relief compelling Defendants to restore all losses arising from the breaches of fiduciary duties that occurred when treatment was denied that is required by the terms of the Plan." *Id.* ¶ 69.

N.R. does not, however, allege any facts to suggest that the Plan itself suffered losses because of the fiduciaries' actions in this case.  On the contrary, N.R. alleges that the defendants' refusal to cover speech therapy benefits for N.R. and other autistic children – allegedly in violation of the MHPAEA – resulted in the Plan's unjust retention of funds that should have

been used to provide therapy to N.R. and other class members.[2]  It follows that N.R. has not alleged facts that would establish a basis that would entitle the Plan (as opposed to him personally) to relief.  *See K.H.B. by & through Kristopher D.B. v. UnitedHealthcare Ins. Co.*, 2019 WL 4736801, at *3 (D. Utah Sept. 27, 2019) ("[I]n the absence of sufficient factual allegations suggesting the Plan suffered monetary losses, this fails to adequately plead

---

[2] It should be noted that this case does not involve a defined contribution retirement plan.  In the context of a defined contribution plan, the First Circuit has explained that

> [t]he chief difference between an action brought under § 502(a)(1)(B) and § 502(a)(2) is the proper defendant, not the proper plaintiff. . . .  [A] suit brought under § 502(a)(2) seeks to hold the plan's fiduciaries liable in their personal capacities for breaches of their duty to the plan. . . .  Bringing the suit under § 502(a)(2) . . . provides an avenue for restoring those benefits to the plan coffers so that they may then be allocated to those who were harmed by the fiduciary breach.

*Evans v. Akers*, 534 F.3d 65, 72-73 (1st Cir. 2008).  Defined contribution retirement plans, however, are unique in that for these types of plans – as distinct from health insurance plans – bringing

> a § [502](a)(1)(B) suit to force the plan to use money already allocated to others' accounts to make good on [the plaintiff's] loss would present a host of difficulties with which few sensible plaintiffs would want to contend.  Indeed, it may be that ERISA's fiduciary obligations prevent plans from paying judgments out of funds allocable to other participants, in which case the plan, *though liable,* would be judgment proof.

*Id.*, quoting *Graden v. Conexant Sys. Inc.*, 496 F.3d 291, 301 (3d Cir. 2007) (emphasis in original).

relief on behalf of the Plan [under § 1132(a)(2)].").  The court therefore will dismiss Count 1 with prejudice.

**Counts 2: Claim for recovery under 29 U.S.C. § 1132(a)(1)(B)**

ERISA provides a private right of action for a participant "to recover benefits due under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits *under the terms of the plan*." 29 U.S.C. § 1132(a)(1)(B) (emphasis added).  N.R. argues that "[d]efendants' uniform exclusion of speech therapy and other services to treat certain developmental mental health conditions pursuant to its Non-Restorative Exclusions violates the requirements of the Parity Act, 29 U.S.C. § 1185a, and its implementing regulations, *which are incorporated in the Plan as additional 'terms of the plan'* under ERISA."  Compl. ¶ 13 (emphasis added).  The court disagrees with N.R.'s premise that the MHPAEA is impliedly incorporated into the terms of his Plan.  *See Christine S. v. Blue Cross Blue Shield of New Mexico*, 2019 WL 6974772, at *13 (D. Utah Dec. 19, 2019) (emphasis added) ("As a separate substantive provision of ERISA, Plaintiffs may enforce their Parity Act rights *only* through Section 502(a)(3) . . . .").[3]

---

[3] The court acknowledges that other judges have assessed Parity Act claims differently.  *Compare Vorpahl*, 2018 WL 3518511, at *3, citing *A.F. ex rel. Legaard v. Providence Health Plan*, 35 F. Supp. 3d 1298, 1304 (D. Or.

Here, N.R. advances only Parity Act arguments; he does not separately "characterize the denial [of coverage for his speech therapy] as a misrepresentation of the actual language of the Plan." *K.H.B. by & through Kristopher D.B.*, 2019 WL 4736801, at *3 (internal quotations and footnote omitted).   Rather, N.R. essentially argues that "[t]he outpatient speech therapy to treat ASD sought by N.R.'s parents would have been covered, but for the Plan's application of its blanket 'Non-Restorative Exclusions.'" Pl.'s Opp'n (Dkt # 16) at 7.   Accordingly, N.R.'s MHPAEA challenge does not

---

2014) ("The more challenging issue is whether, as Plaintiffs allege, the exclusion violates the Parity Act, which is incorporated into the terms of the plan benefits."); *K.H.B. by & through Kristopher D.B.*, 2019 WL 4736801, at *4-6 (dismissing claim for equitable relief under 29 U.S.C. § 1132(a)(3) while allowing a claim under 29 U.S.C. § 1132(a)(1)(B) to proceed while also denying a motion to dismiss plaintiffs' claim for violation of the Parity Act). While *A.F.* is most often cited as support for the incorporation theory, as Judge Chen in the Northern District of California recently noted:

> *A.F.* is problematic in that it does not address the fact that it would seem to place a plan administrator in a Catch 22.  That is, if there were an explicit plan term that arguably conflicted with state law, the plan administrator would have to decide whether to follow the express plan term because if it did not, then it could be sued for breach of fiduciary duty for failure to comply with the plan terms; however, if it did comply with the express plan term, then it could still be sued for failing to follow state law impliedly incorporated into the plan terms.

*Cromwell v. Kaiser Found. Health Plan*, 2019 WL 1493337, at *4 n.3 (Apr. 4, 2019).

allege any right to benefits "under the terms of the plan."  As such, relief under 29 U.S.C. § 1132(a)(1)(B) is unavailable, and the court will dismiss Count 2 with prejudice.

### Count 3: Equitable relief under 29 U.S.C. § 1132(a)(3)

ERISA authorizes a plan participant to bring an action "to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or . . . to obtain other appropriate equitable relief . . . to redress such violations or . . . to enforce any provisions of this subchapter or the terms of the plan." 29 U.S.C. § 1132(a)(3).[4] "[T]the Supreme Court has ruled that Section a(3)'s '"catchall" provisions act as a safety net, offering appropriate equitable relief for injuries caused by violations that § [1132] does not elsewhere adequately remedy.'" *LaRocca v. Borden, Inc.*, 276 F.3d 22, 28 (1st Cir. 2002), quoting *Varity Corp. v. Howe,* 516 U.S. 489, 512 (1996) (alteration in original).[5]  Here, N.R. seeks equitable remedies under §

---

[4] Defendants do not contest that the Plan is subject to the requirements of the Parity Act, nor that the Plan's exclusion of speech therapy for non-restorative purposes may be considered a nonquantitative treatment limitation within the meaning of the Parity Act.

[5] The *LaRocca* court noted that "federal courts have uniformly concluded that, if a plaintiff can pursue benefits under the plan pursuant to Section a(1), there is an adequate remedy under the plan which bars a further remedy under Section a(3)." *Id.* at 28.

1132(a)(3) "arising out of the Defendants' failure to administer the terms of the Plan as modified by the Parity Act and implementing regulations." Compl. ¶ 75.[6]

"Unfortunately, there is no clear law on how to state a claim for a Parity Act violation.   Thus, district courts have continued to apply their own pleading standards." *Michael W. v. United Behavioral Health*, 420 F. Supp. 3d 1207, 1234 (D. Utah 2019); *see also id.* at 1234-1236 (surveying cases and their various pleading standards).   It appears to be generally accepted, however, that plaintiffs pleading a Parity Act claim may allege any of three kinds of violations: they "may allege that the Plan contains an exclusion that

---

[6] Specifically, "N.R. and the class seek equitable remedies including, without limitation, unjust enrichment, disgorgement, restitution, surcharge and consequential damages."   Compl. ¶ 75.   "[T]he fact that . . . relief takes the form of a money payment does not remove it from the category of traditionally equitable relief.   Equity courts possessed the power to provide relief in the form of monetary 'compensation' for a loss resulting from a trustee's breach of duty, or to prevent the trustee's unjust enrichment." *CIGNA Corp. v. Amara*, 563 U.S. 421, 441 (2011); *see also LaRocca*, 276 F.3d at 28, quoting *Mertens v. Hewitt Assocs.,* 508 U.S. 248, 256 (1993) (emphasis in original) ("The Supreme Court has held that, in the context of ERISA, 'equitable relief' includes 'those categories of relief that were *typically* available in equity (such as injunction, mandamus, and restitution, but not compensatory damages).'"); *A.F. v. Providence Health Plan*, 157 F. Supp. 3d 899, 915-916 (D. Or. 2016), quoting *Kenseth v. Dean Health Plan, Inc.*, 722 F.3d 869, 880 (7th Cir. 2013) ("After *CIGNA*, courts have recognized that "[m]onetary compensation is not automatically considered 'legal' rather than 'equitable.'").

is discriminatory on its face [(a facial violation)]; the Plan contains an exclusion that is discriminatorily applied between mental health treatment and its clear medical/surgical analog [(one type of as-applied violation)]; and/or that the Plan's exclusion is the result of an improper process that violates the Parity Act [(another type of as-applied violation)]." *Id.* at 1235-1236.

Here, N.R. appears to allege – although in the murkiest of prose – both facial and as-applied Parity Act violations.[7]  The court will address N.R.'s alleged facial violation as best as it can be discerned.   However, the court

_____

[7] Defendants assert that N.R. fails to allege any as-applied Parity Act claim whatsoever. *See* Defs.' Reply (Dkt # 20) at 3-4.  The court disagrees. *See* Compl. ¶ 53 ("The application of this uniform exclusion is not 'at parity' with the Plan's coverage of medical/surgical services."); *id.* ¶¶ 57-58 (making various assertions associated with the processes by which mental health conditions are assessed in relation to the Plan's exclusions); *id.* ¶ 12 ("Defendants apply the Exclusions, despite covering the same service for non-mental health conditions, such as when needed to treat a stroke or physical injury resulting from an accident.").  The court underscores that any well-pleaded Complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 quoting *Twombly*, 550 U.S. at 570; *but see Bushell*, 2018 WL 1578167, at *6 ("[T]he nature of [nonquantitative treatment limitation-focused] Parity Act claims counsels against a rigid pleading standard.  While a plaintiff may be able to find out what process her insurer used to deny her claim, it is much more difficult to find out the process her insurer uses to evaluate analogous medical claims.  The purpose of discovery is to allow plaintiffs access to this sort of information.").  The court cannot, however, import into the Complaint theories or factual allegations raised for the first time in N.R.'s Opposition to the defendants' Motion to Dismiss.

cannot make out from the opaque pleadings the precise nature of N.R.'s as-applied Parity Act claim.  *Cf. Diaz-Fonseca v. P.R.*, 451 F.3d 13, 42 (1st Cir. 2006) (courts are under no obligation to ferret out legal facts and theories buried in sedimentary layers of an undisciplined pleading).

### Allegations of facial Parity Act violation

Facially, N.R. alleges that "[b]ased upon the plain language of the Plan document and N.R.'s administrative records, the only services that are subject to the Plan's 'non-restorative' exclusions are services that are used to treat developmental mental health conditions, such as ASD."  Compl. ¶ 56. N.R. contends that the Plan violates the MHPAEA on its face for three interrelated reasons: first, because "[t]here is no general exclusion for 'non-restorative' treatment in the Plan"; second, because '[t]here is no special exclusion in the Plan for 'non-restorative' treatment that applies to medical and surgical conditions"; and third, because the Plan contains a "'habilitative' exclusion . . . [which] applies only to mental health services." Compl. ¶ 55.  N.R. cites to a particular portion of the Plan which states: "the following ***mental health (including Autism Spectrum Disorder (ASD) services/substance-related and addictive disorders*** services are not covered: . . . Habilitative services, which are health care services that help a person keep, learn or improve skills and functioning for daily living,

such as non-restorative ABA speech therapy." *Id.* (alteration in original), quoting Dkt # 1-12 at 80 (emphasis in original).  Accordingly, N.R. asserts that under "the plain language of the Plan document and N.R.'s administrative records, the only services that are subject to the Plan's 'non-restorative' exclusions are services that are used to treat developmental mental health conditions, such as ASD." *Id.* ¶ 56.  *See* 29 U.S.C.A. § 1185a(a)(3)(A)(ii) (requiring in part that a Plan impose "no separate treatment limitations that are applicable only with respect to mental health or substance use disorder benefits").

Defendants counter that N.R.'s "coverage was denied pursuant to an exclusion in the Plan that limits coverage for [all] speech therapy to that which is 'restorative,' i.e. intended to regain a level of speech that was 'previously intact.'" Defs.' Mem. (Dkt # 14) at 2.  They contend that "[t]his exclusion applies regardless of the type of condition the speech therapy is intended to treat." *Id.*  They further assert that the "'Exclusions' section of the Plan states generally that the Plan 'do[es] not cover <u>any expenses</u> incurred for services, supplies, medical care or treatment relating to, arising out of or given in connection with . . . ***Speech therapy*** for non-restorative purposes." *Id.* at 8-9 (underlining in original), quoting Dkt # 1-12 at 75, 83 (emphasis in original).  According to defendants, the Plan's language evinces

"no differentiation between mental health benefits and medical/surgical benefits," *id.* at 9, such that "[t]he Non-Restorative [speech therapy] Exclusion applies to any type of [mental health or medical/surgical] condition." *Id.* at 8.

Here, N.R.'s Plan (consistent with defendants' reading) contains an "Exclusions" section which provides for a blanket exclusion of all "***[h]abilitative services*** for maintenance/preventive treatment." Dkt # 1-12 at 79 (emphasis in original). Separately, as the defendants note as well, the "Exclusions" section includes an exclusion of coverage for "***[s]peech therapy*** for non-restorative purposes." *Id.* at 83 (emphasis in original). The Plan expressly links the habilitative services and non-restorative speech therapy exceptions, presenting the latter as an example of the former. *See id.* at 80 (excepting "[h]abilitative services, which are health care services that help a person keep, learn or improve skills and functioning for daily living, such as non-restorative ABA speech therapy").

Neither the Plan's non-restorative speech therapy exclusion nor the habilitative services exclusion purports on its face to address only mental health benefits. While N.R. highlights the existence of Plan language expressly acknowledging that the "habilitative services" exclusion applies to "mental health (including Autism Spectrum Disorder (ASD)

services)/substance-related and addictive disorders," Compl. ¶ 55, quoting Dkt # 1-12 at 80, the Plan's simultaneous presentation of generically applicable habilitative services and non-restorative speech therapy exclusions does not support N.R.'s allegation that the Plan facially excludes benefits for non-restorative speech therapy only for mental health conditions.

### Count 4: Penalties under 29 U.S.C. § 1132(a)(1)(A)

Finally, N.R. seeks "sanctions [under 29 U.S.C. § 1132(a)(1)(A)] for up to $110 per day for defendants' failure to produce or ensure the production of the 'medical necessity criteria for both medical/surgical benefits and mental health and substance use disorder benefits, as well as the processes, strategies, evidentiary standards and other factors used to apply' the Non-Restorative Exclusion," Compl. ¶ 77, quoting 29 C.F.R. § 2590.712(d)(3). "[A] failure to provide requested information does not support a[n] MHPAEA violation, but rather a potential claim for statutory penalties under ERISA." *Kerry W. v. Anthem Blue Cross & Blue Shield*, 2019 WL 2393802, at *4 n.4 (D. Utah June 6, 2019), citing 29 U.S.C. § 1024(b)(4) & § 1132(c).

Under 29 U.S.C. § 1132(a)(1)(A), an individual is authorized to bring a civil action "for the relief provided for in subsection (c) of this section." Subsection (c)(1) provides, in relevant part:

> [a]ny administrator . . . (B) who fails or refuses to comply with a request for any information which such administrator is required by this subchapter to furnish to a participant or beneficiary (unless such failure or refusal results from matters reasonably beyond the control of the administrator) by mailing the material requested to the last known address of the requesting participant or beneficiary within 30 days after such request may in the court's discretion be personally liable to such participant or beneficiary in the amount of up to $100 a day from the date of such failure or refusal, and the court may in its discretion order such other relief as it deems proper.

*See also* 29 C.F.R. § 2575.502c-1 (increasing the civil monetary penalty under

§ 502(c)(1) of ERISA to $110 per day).  In addition, 29 U.S.C. § 1024(b)(4)

provides, in relevant part:

> [t]he administrator shall, upon written request of any participant or beneficiary, furnish a copy of the latest updated summary, plan description, and the latest annual report, any terminal report, the bargaining agreement, trust agreement, contract, or other instruments under which the plan is established or operated.

(footnote omitted); *see also* 29 U.S.C.A. § 1185a(a)(4); 29 C.F.R. §

2590.712(d)(3).

> Under ERISA,

> [t]he term "administrator" means--(i) the person specifically so designated by the terms of the instrument under which the plan is operated; (ii) if an administrator is not so designated, the plan sponsor; or (iii) in the case of a plan for which an administrator is not designated and a plan sponsor cannot be identified, such other person as the Secretary may by regulation prescribe.

29 U.S.C.A. § 1002(16)(A).

26

Because N.R. has not pled facts sufficient to suggest that his document requests were directed to the true Plan Administrator, the court declines to address the merits of N.R.'s statutory penalties argument.  N.R.'s Plan designates defendant Bull as the "Plan Administrator (For All Benefits Except the Disability Plans)."  Dkt # 1-12 at 360.[8]  N.R. does not allege that he requested the documents he seeks from Bull – rather, he alleges that "N.R.'s parents, through counsel, *contacted Raytheon and United Healthcare*," Compl. ¶ 48 (emphasis added), to request documents relevant to his Parity Act claim.  N.R. then directs the court to Dkt # 1-8 – a letter addressing a request for information sent only to United Healthcare, the Plan's Claims Administrator – and not to Raytheon.  Dkt # 1-8 at 2, 4;[9] *see Krauss v. Oxford Health Plans, Inc.*, 517 F.3d 614, 631 (2d Cir. 2008) ("We agree with the district court, *Krauss,* 418 F. Supp. 2d at 434, that since [the defendant company] is not 'the person specifically so designated by the terms of the instrument under which the plan is operated,' 29 U.S.C. § 1002(16)(A)(i), it is not a plan 'administrator' within the meaning of ERISA

---

[8] N.R. does not dispute that defendant Bull is the Plan Administrator. *See* Compl. ¶ 4.

[9] As Claims Administrator, United Healthcare is "not subject to statutory penalties under 29 U.S.C. § 1132(c)(1)(B)." *Tetreault v. Reliance Standard Life Ins. Co.*, 769 F.3d 49, 59 (1st Cir. 2014).

§ 502(c)(1), 29 U.S.C. § 1132(c)(1).”); *David P. v. United Healthcare Ins. Co.*, 2020 WL 607620, at *2, *20 (D. Utah Feb. 7, 2020) (determining that in a Parity Act violations case, where plaintiff requested “Plan documents and the medical necessity criteria” from United Healthcare Insurance Company, “[b]ecause Plaintiffs directed their documents requests to United, the claims administrator, and not to . . . the plan administrator, Plaintiffs’ requests did not trigger the ERISA disclosure requirements and therefore do not warrant imposing statutory penalties.”).[10]

## ORDER

For the foregoing reasons, the defendants’ motion to dismiss is ALLOWED.  Counts 1 and 2 are dismissed with prejudice.  Counts 3 and 4 are dismissed without prejudice.


SO ORDERED.

/s/ Richard G. Stearns
UNITED STATES DISTRICT JUDGE

---

[10] The First Circuit has also concluded that “where an entity of which the administrator is part in effect holds itself out as the plan administrator by officially disseminating such information [required by ERISA to be disseminated] . . . it is subject to § 1132(c) liability should it fail to discharge that role in a proper way.” *Law v. Ernst & Young*, 956 F.2d 364, 373 (1st Cir. 1992).  N.R. does not argue that Raytheon “assumed and controlled the plan administrator’s function of furnishing required information in response to a plan beneficiary’s request.” *Id.* at 372.